## INGRAM *vs.* MITCHELL.

1. The rule of law is stern and well settled, that when a plaintiff comes into Court, he must recover upon his own merits, and not upon the demerits of the defendant, unless where the statute has created an exception.

2. Chancellor Kent thinks the Courts have gone quite far enough in refusing to help either party, in respect to illegal contracts.

3. Whenever the plaintiff can make out his case, without invoking the illegal contract to his aid, he is entitled to recover.

4. Where an agent receives money for his principal upon an illegal contract, he cannot avail himself of that defense in an action brought against him by the principal for money had and received to the plaintiff's use, especially when those who paid over the money to the agent, do not desire that he should retain it.

5. When money is actually paid over upon an illegal contract, it is clear that it cannot be recovered back, the contract being executed, and both parties being in *pari delicto*.

6. A party may, in some cases, be allowed to retain money which was due to him *ex equo et bono*, but which he could not have recovered at law; yet, he never can be allowed to retain money to which he has no claim whatever against the true owner.

7. As to the distinction in some of the cases, resulting from the knowledge or ignorance of the agent, as to the illegality of the contract upon which the money was paid, that can make no difference.

In Equity, from Taylor county. Tried before Judge WOR-RILL, at October Adjourned Term, 1859.

This bill was filed by Bryan Ingram to make Benjamin F. Mitchell account to him for the proceeds of the sale of a negro slave named Simon, that the complainant, as owner, had placed in the hands of defendant for sale, under the circumstances following:

In the year 1856, the slave Simon was committed to jail to await his trial on the charge of attempting to commit a rape on a free white female in the county of Taylor; and afterwards, at the October Term, 1856, of Taylor Superior Court, a true bill, charging him with said crime, was found

against him.  Previous to October Term, Ingram, the owner of the slave, gave bond for the appearance of the slave at Court, and took charge of him, the prosecutor consenting. On the 16th day of August, 1857, Ingram entered into an agreement with Mitchell by which the latter should take Simon away and sell him, and that in the event he sold him, he was to account to complainant for $1,200 00, as the amount to be due him; if no sale, then the boy was to be returned to his owner.

This was the agreement: Defendant was to be the agent, or attorney-in-fact, of complainant in the sale of the slave; but as a mode of carrying the agreement into effect, and to enable Mitchell to convey title to the party to whom he should sell, Mitchell gave Ingram his promissory note for $1,200 00, payable to him or bearer, by the 1st day of June, 1858, with a condition attached thereto, that should Mitchell not sell Simon, butshould return him in good condition, then the note to be void.  Ingram then executed to Mitchell a bill of sale for Simon, and delivered him into his possession, and Mitchell afterwards sold him in Baker county, Georgia, for $1,200 00.

Ingram's object in sending off the slave and selling him, and which was understood between the parties at the time, was to save his life, then endangered by the charge against him.

At the April Term, 1857, of said Superior Court, the bill of indictment against Simon was *nol prossed.*

Afterwards, Mitchell being called on to pay over the $1,-200 00, the proceeds of the sale made by him, refused to do so; and this bill having been filed against him to require him to account for such proceeds, he sets up, in his answer, the circumstances out of which the agreement between him and the complainant arose, insisting that the agreement having been made to screen Simon from trial and punishment, is illegal, and that he cannot be compelled to account to complainant, as prayed for in the bill.

These facts being developed on the trial, the jury, under the charge of the Court, found for the defendant.

Whereupon, counsel for complainant moved a rule for a new trial, on various grounds.  The 3d and 4th are all that are deemed necessary to be here stated, and are as follows:

3d.  Because the Court erred in ruling and deciding, on motion being made by defendant, to dismiss complainant's bill;

Ingram *vs.* Mitchell.

that complainant could only recover, if at all, on the note or contract in writing set up in complainant's bill, and in restricting complainant's rights to a decree, if he had any right to said contract or note.

4th. Because the Court erred in charging the jury in this case, that if they should find that the negro Simon, the subject of this suit, was charged with a capital crime, and that complainant and defendant entered into the contract or agreement sought to be enforced by this suit, for the purpose of preventing the negro from being brought to trial and punishment for such crime, then the agreement was void and could not be enforced in a Court of justice; and it made no difference whether the Act of 10th May, 1770, was of force or not; that in the absence of legislative enactments, such contracts or agreements are void, as opposed to the policy of the law, being in prevention of public justice, and they must find for defendant.

The Court refused the rule for a new trial as to all the grounds, and counsel for complainant excepted.

GRICE & WALLACE, and HUNTER, for plaintiff in error.

SMITH & POU, *contra.*

*By the Court*—LUMPKIN, J., delivering the opinion.

I do not think it altogether certain that Mr. Ingram either violated the Act of 1770, (*Prince,* 780), which inflicts a penalty of £200 upon any one who conceals and carries off a slave accused of a capital crime, so that he cannot be brought "to trial and condign punishment," or has committed an act against the public justice of the county. True, he directed Mitchell to convey the boy away secretly and to sell him; but he did not require him to be taken beyond the limits of the State. And in point of fact, he was sold in Dougherty county, not very remote from the place where the alleged offense was committed. The prosecution was quashed ten or twelve days before the negro was sold, the woman herself and

every body else being satisfied of his innocence; and then he was immediately repurchased and brought back by Ingram, where he has remained unmolested ever since.

I remark, that I assume, as the foundation of a portion of these remarks, that the facts were in, which the plaintiff offered to prove, but which he was not allowed to introduce by the Court, and, as we think, improperly.

I am fully sensible of the gross impropriety of endeavoring to screen a slave from merited punishment, especially for offenses committed against white females. I am not insensible to the fact, however, that, prompted by humanity, and from no mercenary motives, masters are sometimes induced to put their slaves out of the way to prevent them from becoming the victims of popular excitement, until the tempest of passion is past and reason has resumed her sway. And while this motive even cannot justify the act, it goes far to mitigate its criminality.

I confess, that it is not without doubt and some misgiving that I have come to a conclusion in this case. Chancellor Kent, in *Vesicher vs. Zate*, 11 *Johnson's Rep.*, 23, thought the Courts had gone quite far enough, when they refuse to help either party, with respect to these illegal contracts; and he referred to the statute against gaming, which allowed the loser to recover back of the owner his lost money, thereby inferring that the Courts had gone one step beyond the law-giver; and yet, the rule of law is stern and settled, that when the plaintiff comes into Court, he must recover on his own merits, and not upon the demerits of the defendant, unless where the statute has created an exception.

The rule hitherto applied by this Court, and perhaps by the English Courts, is this: that whenever the plaintiff can make out his case without invoking the illegal contract to his aid, he is entitled to recover. The Judge held in this case, that the plaintiff must recover upon Mitchell's note or not at all. Concede this: What is to prevent Ingram from recovering on the note? True, it has a condition annexed to it to the effect that if the negro was not sold, and returned in good condition, the note was to be void. The boy was not returned, but sold. Why should Mitchell not pay the note?

But apart from this, Ingram ratifies the sale and claims the purchase-money. Can Mitchell refuse to account for it? Mitchell sets up the illegal contract to screen himself from

liability. Will the Court allow *him* to protect himself under it? He must abide by the contract or repudiate it. If he abides by it, he must pay; if he repudiates it, he holds in his hands the price of Ingram's negro, and he must turn it over.

There is a class of cases which puts the right of the party to recover upon the ground of agency; and *Tennant vs. Elliott*, (1 *Boss. and Pul.*, 3), is a strong authority upon that point. There, the defendant being a broker, effected an illegal insurance on a ship. The vessel being lost, the underwriters paid over the money to Elliott, who refused to pay it over to the plaintiff, on the ground of the illegality of the contract. But the Court said that he should not be allowed to set up the illegality of the contract as a defense in an action brought against him by Tennant, for money had and received for the plaintiff's use. This case must be overruled, or else the complainant is entitled to maintain this bill.

Chief Justice EYRE said: "The question is, whether he who had received money to another's use on an illegal contract can be allowed to retain it, and that not even at the desire of those who paid it to him? I think not." And Mr. Justice BULLER asked: "Can the defendant in conscience keep the money so paid? For what purpose should he retain it? To whom is he to pay it over? Who is entitled to it but the plaintiff?"

In a note to this case it is said: If this money had been paid by the underwriters directly to Tennant, the insured, it is clear he could retain it against them, the contract being executed, and both of the parties being in *pari delicto.*" (Citing *Douglas,* 470; *Cowper,* 199, 200, 792; 1 *Hen. Black.*) The money would, in that case, in any sense, belong to Tennant; does it not equitably belong to him, when paid to his agent for him?

And in *Farmer vs. Russell, ibid,* 296, it was held, that while a party in some cases would be allowed to retain money which was due to him *ex equo et bono*, but which he could not have recovered at law, yet he never can be allowed to retain money to which he has no claim whatever against the true owner.

We agree with Mr. Justice ROOKE, in the last case, that the distinction, as to the knowledge or ignorance of the agent, can make no difference, as it would produce this strange consequence: that if he be ignorant of the illegality of the con-

Ingram *vs.* Mitchell.

tract, he shall be answerable in this action ; but if guilty as *particeps,* he shall be free. His innocence should work a loss to him, while his guilt shall be an indemnity.

We hold, therefore, that the Court was wrong in charging the jury, that the defendant was not liable upon the case made by the pleadings and evidence.